UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA                    17-MJ-524(JWF)

vs.
                                            Rochester, New York
WILLIAM ROSICA,                             March 3, 2017
                Defendant                   10:43 a.m.
- - - - - - - - - - - - - - X


                        TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JONATHAN W. FELDMAN
                    UNITED STATES MAGISTRATE JUDGE


                        JAMES P. KENNEDY, JR., ESQ.
                        Acting United States Attorney
                        BY: MELISSA MARANGOLA, ESQ.
                            CRAIG GESTRING, ESQ.
                        Assistant United States Attorneys
                        6200 Federal Building
                        Rochester, New York 14614


                        TREVETT CRISTO SALZER & ANDOLINA, P.C.
                        BY: CLARK J. ZIMMERMAN, JR., ESQ.
                        2 State Street, Suite 1000
                        Rochester, New York 14614
                        Appearing on behalf of the Defendant

ALSO PRESENT:        Camaryn Lochner, U.S. Probation


AUDIO RECORDER:      Natalia Reinstein


TRANSCRIBER:          Christi A. Macri, FAPR-CRR
                      Kenneth B. Keating Federal Building
                      100 State Street, Room 2120
                      Rochester, New York 14614


(Proceedings recorded by electronic sound recording,
transcript produced by computer).

1      **P R O C E E D I N G S**

2                  *   *   *

3           (**WHEREUPON**, the defendant is present).

4           **THE CLERK:** This is United States vs. William

5    Rosica, 17-MJ-524.

6           **MAGISTRATE JUDGE FELDMAN:** All right, good morning.

7    We're on for a detention hearing.  Are the parties ready to

8    proceed?

9           **MS. MARANGOLA:** Yes, Judge.

10          **MR. ZIMMERMAN:** Yes, Your Honor.

11          **MAGISTRATE JUDGE FELDMAN:** All right. The Government

12   may proceed.

13          **MS. MARANGOLA:** Judge, we're moving forward pursuant

14   to Title 18 of the United States Code, Section 3142(f)(2)(B).

15          As the Court's aware, this is a five year maximum

16   offense which requires the Government then to show clear and

17   convincing evidence that he is a danger and there are no

18   combination of conditions that would ensure the safety of the

19   community.

20          That subsection shows that the Government may move

21   under this charge if we can show that there's a serious risk

22   that the defendant will obstruct or attempt to obstruct

23   justice or threaten, injure or intimidate or attempt to

24   threaten, injure or intimidate a prospective witness or juror

25   in this case, and that's exactly the grounds we're moving

1   under, Judge.

2            I know you're fully familiar with this case as

3   reviewing the complaint, but the main witness in this case is

4   actually the victim, who he does pose a substantial risk of

5   threatening and intimidating prior to trial.

6            Judge, I've run a quick review of the guidelines in

7   this case.  Again, I know the Court is aware it's only a five

8   year max, but the quick review of the guidelines would show

9   should he plead guilty he's looking at about 24 to 30 months.

10           So being in jail at this point should really just

11  be focused on the fact whether or not he poses a danger to

12  this victim, and that's what I'm asking the Court to focus on

13  at this time.

14           Looking at the factors under 3142, the (g) factors

15  that the Court has to consider, I'd like to direct your

16  attention to the nature and the circumstances of this charge,

17  which is really all encompassing of the danger he poses to the

18  victim in this case.

19           I mean, the offense itself, Judge, is involving the

20  stalking and terrorizing of the victim in this case for a year

21  long period.  And make no mistake, this is a domestic violence

22  situation.  It doesn't allege physical abuse necessarily,

23  Judge, but the psychological and emotional abuse that this

24  woman suffered at the hands of this defendant for a year was

25  all encompassing.

1            And I will tell you, I talked to her as recent as

2    yesterday, Judge, and she is absolutely terrorized that this

3    defendant now knows she went to the authorities.  She's

4    absolutely terrorized that there will be serious repercussions

5    should he be released.

6            So are her family members, her employers, her work

7    colleagues.  Essentially everyone who is in a close community

8    with this victim, Judge, is absolutely terrorized of this man.

9            I'd like to direct your attention, Judge, to page 6

10   of the criminal complaint.  It's paragraph 12.  And this

11   really shows the defendant's state of mind, Judge.  As the

12   Court recalls, he said to the victim in person when she broke

13   up with him or shortly thereafter, "I'm at a crossroads,

14   either I let you walk away and we live our separate lives or

15   short of killing you I destroy every aspect of your life.  You

16   tell me what I should do."

17           Approximately a week later he follows up with her

18   and says, "and with regard to our last conversation in the

19   park, I'm still at a crossroads.  I must protect my better

20   interests."

21           Judge, that speaks to his state of mind.  And as

22   the Court's aware, following that conversation, he absolutely

23   followed through.  He attempted to destroy every aspect of

24   this woman's life, and he did both emotionally and

25   psychologically.

1          I'd like to again address the criminal complaint,

2    Judge.  It's all spelled out, but some of the things that the

3    defendant did on a daily basis or by daily basis for a period

4    of a year were attempting to gain access to her cell phone

5    records; the Court's aware she kept getting messages from her

6    carrier on a repeated basis saying her account had attempted

7    to be changed.

8          So she would change her cell phone carrier and the

9    telephone number and shortly after that she would be receiving

10   the same messages, which obviously was concerning to her how

11   is this individual finding out so quickly that I changed my

12   cellular telephone number.

13         At that point he started to attempt to hack her

14   employer, who is a local law firm, hack her employer's

15   internet access, hack their -- the total company's e-mail

16   accounts.  We have approximately 282 times that that was

17   attempted to be done.

18         Fortunately, we don't have evidence that he was

19   successful in hacking the e-mails of the company, but once

20   that was -- that attempt was completed, he started sending

21   e-mails to her employer trying to get her fired.

22         The Court has reviewed the complaint, I know, and

23   those e-mails are spelled out.  Not only was he harassing her,

24   he was harassing her employer, the office manager, her

25   colleagues in an attempt to get her fired.

1                  Then just as concerning, her pharmacy starts

2    getting contacted.  She stopped refilling her prescriptions

3    automatically and yet suddenly they started up again.

4                  Her pharmacy complained that an individual claiming

5    to be her doctor called several times inquiring about her

6    medications.  Obviously, a violation of her trust.

7                  And when that individual couldn't get the

8    information and they started asking questions, those

9    communications stopped.

10                 She would routinely get e-mails from mental health

11   companies that she -- saying that she inquired about mental

12   health facilities across the country and that congratulating

13   her on being the first step to address her own mental health

14   issues.

15                 So the defendant was contacting all of these

16   inpatient centers across the country signing her up for

17   services that she didn't do.

18                 With that he would send e-mails from anonymous

19   websites or anonymous e-mail companies and providers

20   consistently telling her and urging her to commit suicide;

21   calling her harassing names; contacting her family members,

22   including her ex-husband and other members of her circle,

23   harassing them about her activities, her whereabouts and her

24   relationships .

25                 I mean, it was ongoing, again daily basis.  Her

1  privacy was being violated and her family members and her were

2  being harassed.

3          Her ex-husband, Your Honor, also had complaints

4  that his financial records were attempted to be reviewed.  We,

5  as an investigative technique, looked into that and there did

6  appear to be a substantial number of attempts made into his

7  financial accounts.  Fortunately, those were unsuccessful.

8          The defendant somehow figured out a way to harass

9  her in juvenile ways as well: Restarting her Time Warner Cable

10 box on a daily or weekly basis, Judge, just to be annoying for

11 lack of a better term.

12         Her ex-husband during the Super Bowl -- and I say

13 this is important just to show the state of the mind of the

14 defendant and how focused he was on harassing this woman and

15 her ex-husband -- when the Super Bowl this year went into over

16 time, the very minute it went into over time the ex-husband's

17 cable suddenly shut off.  And this was a pattern of conduct

18 that the victim kept having reoccur at her home.

19         And shortly before that the defendant -- excuse me,

20 the victim's ex-husband started having his cable shut off.  So

21 during probably the biggest game of the year at the most

22 critical moment, instead of focusing on the game he's thinking

23 how can I harass this person and her ex-husband, who there is

24 no connection to, in the most annoying way, and he does it.

25         It was constant 24/7 harassment.  On Valentine's

1 Day he sent her flowers saying your friends at the mental

2 health clinic say hello.

3        Judge, it was relentless.  And, again, this woman

4 is absolutely terrified, has been for a year, which is why the

5 investigation needed to be secret until we were ready to

6 arrest him.

7        But even now as it stands today she's worse than

8 she has ever been in terms of fear from this defendant now

9 that he's aware that she has gone to local law enforcement.

10        The case is very strong.  I know the Court again

11 has reviewed several search warrants and items related to the

12 investigation in this case.  You're fully familiar with the

13 items that we've obtained as far as evidence.

14        But quickly the defendant, you know, we've

15 corroborated through the use of subpoenas that this defendant

16 was utilizing the Tor network, which I know the Court is

17 familiar with, to send these e-mails and hide his identity to

18 prevent her from identifying him as the stalker/harasser of

19 all these e-mails.

20        We've confirmed through various means that this

21 defendant was accessing the Tor network at the same or similar

22 time that the harassing e-mails were sent to her.

23        We employed a NIT search warrant to determine that,

24 in fact, the IP address that originated, the fake e-mails that

25 were sent to her employer, actually came from this defendant's

1   home address.

2          So the case is strong.  There is no question that

3   this defendant is the individual responsible for the harassing

4   behavior.

5          We also employed a pole camera approximately a

6   block and a half from her house in a residential area.  The

7   area (sic) was placed outside a stop sign, Judge, so that law

8   enforcement could best see the vehicles at a stopped condition

9   so we had more time to identify the vehicles that went by.

10          The pole camera was placed in an area that needs to

11   be traveled through to get to the victim's home.  I don't want

12   to say what town she lives in, but the defendant and the

13   victim in this case live in two completely separate towns and

14   there would be absolutely no reason for the defendant to be

15   driving by this pole camera.  It wasn't on a main road.

16   Again, it's on a residential road that leads directly to her

17   home.  He would have no reason to be traveling on that other

18   than to drive by her home.

19          When the victim complained to law enforcement that

20   she observed the defendant driving by her home and, again, his

21   efforts were escalating from cyber stalking to actual

22   stalking, her complaints were confirmed via the pole cam that

23   the defendant was in the area driving a vehicle that was later

24   scene at the Irondequoit Police Department, his place of

25   employment.

1          Neighbors had complained to law enforcement that

2    they also saw suspicious activity driving by her house at

3    certain hours of the day.  So his behavior not only impacted

4    the victim in this case, her family members, but neighbors.

5          In addition, Judge, the physical stalking was

6    established when, as stated in the complaint, the victim went

7    to different locations and then was contacted by the defendant

8    shortly thereafter saying I saw you at this location, what are

9    you doing here?

10         For example, she got a hair cut one day as

11   referenced in the complaint.  Shortly thereafter, I think the

12   following day, she receives an e-mail from an anonymous source

13   saying -- discussing the hair cut that she received the day

14   before.  Obviously, showing that this defendant tracked her,

15   trailed her or stalked her in some way to determine her

16   location at a specific time.

17         She went to Canal Days in Fairport.  Again, a town

18   that the defendant does not reside in and really has no

19   business being there, other than the Government's assertion,

20   to observe her activity.

21         But she went to Canal Days, parked her car in her

22   ex-husband's driveway and shortly thereafter her and her

23   ex-husband start getting harassing e-mails and text messages

24   describing her parking in his driveway.

25         I mean, this pattern of conduct is ongoing.  One

1    day she went to work on a Saturday, which was unusual, and he

2    commented on that shortly thereafter.  So as time went on,

3    Judge, over a year long period, the -- the involvement of the

4    defendant actually escalated as opposed to deteriorated over

5    time as you would expect someone to do as a relationship

6    became further and further distanced from you.

7             The case is very strong.  The allegations are

8    incredibly concerning.  Like I said, the victim is absolutely

9    terrified.

10            Another factor for the Court to consider is the

11   person's character, his mental condition, his family ties, his

12   employment and I'd like to focus on that.

13            First of all, Judge, I would submit that someone

14   who engages in this pattern of conduct, whether they are

15   admitting it or not, does have some mental issue that needs to

16   be addressed through this Court or through Probation.  This is

17   not rational behavior that anyone would engage in over this

18   period of time.

19            His character, Judge.  Since yesterday's court

20   appearance when this appeared on the news, myself and law

21   enforcement received several phone calls from concerned

22   citizens.  And what has come to fruition and, to my knowledge,

23   has been a pattern of conduct that this is not the first time,

24   this victim is not the first person he's done this to.

25            I was contacted last night by a retired Monroe

1  County lieutenant, Sheriff's Office lieutenant, who was

2  formerly the Chief of Brockport University Police, his name is

3  Robert Kehoe, he said I could say his name in court, his

4  cousin was actually the victim of -- he said, and I quote, a

5  carbon copy situation of what he's read in the criminal

6  complaint.

7           His cousin was in a relationship with this

8  defendant and in 2009 she ended the relationship with the

9  defendant and was cyber stalked, stalked for a period of over

10 one year.

11          That victim as well, Judge, was a female.  She was

12 absolutely terrified because the defendant was in law

13 enforcement, and similar to this victim knew that he had

14 friends and colleagues in local law enforcement and, frankly,

15 didn't know what to do with the information.  Didn't feel like

16 she could go to local law enforcement.

17          She advised Robert Kehoe of this information

18 because they were family, they were first cousins.  And he in

19 turn referred her to a Monroe County Sheriff's victim witness

20 associate.  Oddly enough, that victim witness advocate or one

21 of their colleagues contacted the FBI this morning and

22 confirmed that information.

23          Again, based on I believe what they saw in the

24 news, identified his name and said this happened previously,

25 this is incredibly concerning; that woman again didn't want to

1  go forward to law enforcement, but was terrified of him.  In

2  that case there were allegations of a forcible rape.  I have

3  not had the opportunity since they just came this morning

4  to --

5          **MR. ZIMMERMAN:** Judge, I really have to object --

6  and I'm sorry to interrupt, but I think we're way outside the

7  bounds here for that to even be brought up.

8          I understand she can make a proffer, but that I

9  think is way outside the boundaries of what's allowed.

10          **MAGISTRATE JUDGE FELDMAN:** Let me just ask.  Is

11  there the potential here for further charges?  Is that what

12  you're getting at?

13          **MS. MARANGOLA:** I'm showing you his history, Judge,

14  and his course of conduct.  That's really what I'm getting at

15  here.

16          **MR. ZIMMERMAN:** Well, there's no history of this

17  alleged rape.  That's what I'm objecting about.

18          **MAGISTRATE JUDGE FELDMAN:** I understand.  Is

19  there -- is there a continuing investigation here?

20          **MS. MARANGOLA:** Yes, Judge, we're going to look into

21  that obviously.

22          **MAGISTRATE JUDGE FELDMAN:** Okay.

23          **MS. MARANGOLA:** And it would be potential 404(b).  I

24  mean, it will be relevant at this -- at this juncture or down

25  the road in this case.

1          And I would submit it is absolutely relevant if the

2   defendant -- this was a one time deal, that's something for

3   the Court to consider.  But the fact that there's a pattern of

4   conduct and this happened with another woman in 2009 is

5   something that this Court certainly needs to consider for

6   dangerousness.

7          I would note that this morning, Judge, the

8   defendant's own brother, who is a Catholic priest in Greece,

9   contacted the FBI with substantial concerns saying he felt

10  important to contact them and ask that his brother not be

11  released due to safety concerns.

12         I haven't -- again, we have to follow-up on those,

13  but there was another individual, a retired law enforcement

14  officer, who previously worked with the defendant, said that

15  he is one of the most manipulative individuals that he's ever

16  come in contact with.  And when this defendant was hired by

17  Irondequoit Police Department, this law enforcement officer

18  actually contacted them directly and said you're going to

19  regret that based on his character.

20         So again in 24 hours, less than 24 hours these are

21  the types of information that are coming forward, Judge.  His

22  own family member; a prior victim; and a law enforcement

23  colleague expressing their grave concern over this defendant's

24  release.

25         I would note, Judge, that I've had the opportunity

1    to review -- well, before I go there, excuse me, I would note

2    that yesterday the defendant was actually interviewed by law

3    enforcement after he was advised of his *Miranda* warnings,

4    Judge.

5            He did not admit any contact -- any contact with

6    the victim.  In fact, he made several denials that we know

7    were untruthful and we anticipate filing an additional charge

8    under Title 18, United States Code, 1001.

9            Specifically, he indicated he's aware of a Tor

10   network, but he's never used it on his computer.  He has no

11   reason to, which based on our search warrants and the

12   electronic information we seized as part of this investigation

13   we know not to be true.

14           He said he hasn't seen the victim in seven months,

15   he hasn't had any reason to go by her house or her area of

16   employment, he's not contacted her at all, which again based

17   on the evidence in this case we know to be untrue.

18           I would note again I have to show that there are no

19   reasonable combination of conditions that can be imposed here

20   to assure her safety; and I reviewed the Pretrial Services

21   report from the Probation Office and they are in agreement

22   with that.  They don't feel that there is any combinations

23   that they can set.

24           And I know this is an unusual case, given the fact

25   that the maximum sentence is five years, but these are unusual

1  circumstances.  And when I thought about this from our last

2  court appearance to today, I don't think that electronic

3  monitoring, home confinement can reasonably assure this

4  victim's safety.  I really don't, and Probation is in

5  agreement with that.

6          It is easy for me to stand here and say Probation

7  can monitor him.  But when you are actually the person

8  monitoring him and going to this individual's house, the fact

9  that he is a police officer, had access to guns -- and I will

10 note there are three currently in his house still that would

11 need to be removed -- when you are actually the person going

12 there to come into contact with someone who has been trained

13 physically as a law enforcement officer, is fully aware of law

14 enforcement procedures and things, it puts Probation at a

15 severe disadvantage walking into his house on any given day,

16 and I completely understand their concerns.

17         One of the major concerns that I have with respect

18 to this victim again is that this is a domestic violence

19 situation.  It is emotional and physical abuse that has gone

20 over for a period of time.

21         Now with these types of situations, the point that

22 the victim leaves, the point that the abuser is no longer in

23 control is the very time that these situations escalate.

24         I have no confidence that an ankle bracelet is

25 going to prevent him from driving to her home, doing something

1   to hurt her or one of her family members, given the fact that

2   again he no longer is in control; he is suspended from his

3   job; he's essentially lost a significant amount of his life,

4   his livelihood, all of his security is gone, Judge.

5           So this is the pivotal moment that something

6   terrible could happen, and the Government does not feel

7   comfortable saying that him being on an electronic monitoring

8   bracelet is enough to protect her.

9           I would note also that the Irondequoit Police

10  Department has, with my understanding, initiated proceedings

11  to suspend him without pay.  Right now he's again being

12  suspended with pay, but that's just due to a procedural

13  requirement.  They've already started proceedings.  So he's

14  essentially in the process of losing his job.

15          Again, he's in the news.  His family's aware of it.

16  He knows the victim is no longer under his control and has

17  gone to the authorities despite what he told her.

18          So for all those reasons, Your Honor, I truthfully

19  cannot say that there are any combinations that would assure

20  her safety.

21          **MAGISTRATE JUDGE FELDMAN:** Okay, thank you.

22  Mr. Zimmerman.

23          **MR. ZIMMERMAN:** Thank you, Your Honor.  This statute

24  that Mr. Rosica's charged under carries or alleges a wide

25  range of offenses from threaten to kill to intimidation and

1  harassment.

2          I don't believe that even despite what has been

3  stated by the Government, that there's been any allegation of

4  threats to kill.  So I think the main focus of the strength of

5  their case surrounds allegations of intimidation and

6  harassment.

7          **MAGISTRATE JUDGE FELDMAN:** Do you think that the

8  language that the defendant allegedly used as set forth in

9  paragraph 12 of the criminal complaint would be a threat to

10  kill?

11          **MR. ZIMMERMAN:** Is that the allegation about --

12          **MAGISTRATE JUDGE FELDMAN:** I'm at a crossroads,

13  yeah.

14          **MR. ZIMMERMAN:** Well, I think it says just the

15  opposite.  I'm at a crossroads, I can either move on or I can

16  ruin your life short of, I think, killing you, something like

17  that.

18          So, if anything, that statement, if accepted as

19  true, and the prior allegations of stalking, I guess, that

20  Ms. Marangola raised, show just that there is no threat of

21  physical violence, certainly no threat of the most extreme

22  here, threaten to kill or cause serious physical injury.

23          The prior allegations that Ms. Marangola cited from

24  2009, I believe, show just the opposite.  So if you accept

25  this complaint as true and you accept that as true, it seems

1  to, again accepting -- we're all at allegations here, Judge.

2          **MAGISTRATE JUDGE FELDMAN:** Mm-hmm.

3          **MR. ZIMMERMAN:** It would show just the opposite,

4  that there is no threat of physical -- physical bodily harm.

5  And Ms. Marangola said at the end that there's allegations

6  here of physical abuse.  There are no allegations of physical

7  abuse against the complainant in this case.

8          **MAGISTRATE JUDGE FELDMAN:** Where do you think

9  encouraging someone repeatedly to commit suicide falls on that

10  scale?

11          **MR. ZIMMERMAN:** Well, again, accepting those

12  statements as true -- and I disagree with Ms. Marangola as to

13  the strength of the People's case.  She says, well, they have

14  various means of establishing that.

15          However, I'm not here to besmirch at all the

16  complainant.  I'm not going to use her name, but upon

17  information and belief, there have been some attempts by her

18  or at least psychiatric episodes on her behalf.

19          Now, that cuts both ways, I understand that.  But

20  what the Court, I think, has to examine is, is Mr. Rosica a

21  threat to commit violence against this complainant or other

22  members of the community.

23          And she now has support not only of the Federal

24  Government, but it sounds like many other agencies,

25  co-workers, friends.

1          And so to answer your question directly, a

2    suggestion or an innuendo is a far cry from an actual attempt

3    to commit physical bodily harm or violence against an

4    individual.

5          **MAGISTRATE JUDGE FELDMAN:** Again, I understand the

6    problem with talking too much about the merits of the case and

7    the strength of the Government's case, but you described it as

8    "innuendo" some of the things that were done.

9          But if the Government is correct and just using the

10   kinds of things that are alleged here in the complaint about,

11   you know, sending someone links on how to commit suicide and

12   how to commit suicide in painless ways and threatening to

13   reveal personal and confidential information to the victim's

14   child about mental health issues --

15         **MR. ZIMMERMAN:** None of which was done, from my

16   knowledge.

17         **MAGISTRATE JUDGE FELDMAN:** No, I understand that.

18   But do you think there is a danger there that we're focusing

19   on whether someone actually committed an act of violence or

20   terrorized someone to the point where they would want to harm

21   themselves?

22         **MR. ZIMMERMAN:** Well, I think we have to look at a

23   little bit of a future aspect here because the standard is, is

24   he a threat in the future.

25         **MAGISTRATE JUDGE FELDMAN:** Mm-hmm.

1          **MR. ZIMMERMAN:** The Government can make arguments

2   all day long and you seem to be making arguments that those

3   indicate potential acts or threats of violence.  I understand

4   that.

5          **MAGISTRATE JUDGE FELDMAN:** Right.

6          **MR. ZIMMERMAN:** But assuming those to be true, those

7   are past allegations and these stem over a year from what I

8   understand from the Government's case, but are there

9   reasonable alternatives to ensure the safety of the

10  complainant?

11         And I would suggest to the Court that there are.

12  There are several, including the fact that the complainant

13  reported this to the authorities, to the fact that there's

14  been a -- I'm not sure when the investigation began, but it's

15  been an extensive investigation resulting in the filing of

16  these allegations.

17         That in and of itself, I believe, ensures the

18  safety of this complainant.  She knows where to go to get

19  assistance, she knows how to do that.  She has those already

20  in place.

21         And, frankly, Mr. Rosica, who's been a police

22  officer for 13 plus years, is fully aware of the consequences

23  of violating any Order of Protection or going anywhere near

24  the complainant or violating any court order that would be in

25  place.

1        And the fact that he has been a police officer for

2   13 years addressing the -- some of the issues of character, in

3   addition to being a volunteer fireman, in addition to being

4   with the -- I believe it's called the Badge of Honor, and

5   nobody comes forward with all these eyes -- educated law

6   enforcement, members of the community eyes -- with any

7   concerns, I think cuts against the fact that there's some

8   serious underlying mental health issues going on here or

9   there's really a great let down in our law enforcement.

10       **MAGISTRATE JUDGE FELDMAN:** Assuming that the

11  Government can tie the defendant's conduct to the allegations

12  in the complaint, does that not raise questions in your mind

13  about the mental health of your client?

14       **MR. ZIMMERMAN:** Well, I would concede it would.

15  There would be some mental health issues.  It's the level of

16  that.  Frankly, Judge, we all have some degree of mental

17  health issues.  I'm not trying to be cute about this.

18       But it would also advocate for some sort of

19  specialized release so he could seek treatment.  If he's

20  incarcerated, he's not going to get that sort of specific

21  mental health treatment, and I would certainly recommend that

22  that be carried through.  So that could be by consent a

23  condition of his release.

24       But, again, Judge, the pattern of conduct, and

25  Ms. Marangola stated it, has been to harass and intimidate,

1  not to cause bodily injury.  In fact, there has been no

2  injury, there's been no physical abuse in the past and these

3  recent allegations that have come up, I can't comment on

4  those, I'd ask the Court not to consider those.

5          Present in court on support -- in support of

6  Mr. Rosica are his sister and his estranged wife, who I

7  referred to yesterday, I believe.  They're both here in

8  support of him.

9          His brother that Ms. Marangola mentioned, he is a

10 priest.  He's in Toronto, Canada from what I believe, and he

11 has very little contact, if any, with Mr. Rosica.

12         The people who do have contact with him are here,

13 his family members.  I believe he has quite an accomplished

14 family.  In addition to his brother the priest, he has a

15 sister a nun, she's not here, but I believe she's supportive

16 of him.

17         I think that the Court can impose special

18 conditions which would reasonably ensure the safety of the

19 complainant and other members of the community by imposing

20 home incarceration, by imposing electronic monitoring, by

21 imposing a condition obviously that he not possess any

22 weapons, something he's more than willing to do.

23         There was some talk yesterday about imposing a

24 condition that he not have access to computers.  Certainly he

25 would be in agreement with that.

1    Depending on the Court's ruling, I may ask that he

2  be allowed to maintain a smart phone, but we would certainly

3  comply with any conditions that the Court imposes so that,

4  one, he can aid in his defense; two, he would seek mental

5  health counseling or full psychological evaluation; three, he

6  does have several family responsibilities, including the

7  health of his wife, they do co-parent as much as they can

8  their 17-year-old son.

9    So I'd ask the Court to evaluate this on the

10  spectrum of the allegations.  Ms. Marangola can theorize that

11  this is just, you know, building to a point where there's

12  certainly going to be something, but there's been no clear and

13  convincing evidence that there's been any attempt at actual

14  physical bodily harm on behalf of Mr. Rosica against any

15  individual at this point.

16    And I think the fact that just because if you take

17  all these as true and somebody has some mental health issues,

18  that doesn't equate with violence.

19    So I would ask the Court to impose special

20  conditions of release and obviously, as I stated, we would

21  comply with anything the Court orders.

22    **MAGISTRATE JUDGE FELDMAN:** Thank you, Mr. Zimmerman.

23    **MR. ZIMMERMAN:** Thank you.

24    **MAGISTRATE JUDGE FELDMAN:** Anything else?

25    **MS. MARANGOLA:** Just very briefly, Your Honor.  As

1  Mr. Zimmerman pointed out, the defendant is fully aware at

2  this point what these -- the ramifications for his actions

3  would be, and I would submit as a law enforcement officer for

4  13 years, while he was sworn to uphold the law and protect and

5  serve the community, he was fully aware that stalking this

6  woman was illegal and he did it anyway.  That's it.

7          **MAGISTRATE JUDGE FELDMAN:** Okay, the Government's

8  proof closed?

9          **MS. MARANGOLA:** Yes, Judge.

10         **MAGISTRATE JUDGE FELDMAN:** Defense proof closed?

11         **MR. ZIMMERMAN:** Yes, Your Honor.

12         **MAGISTRATE JUDGE FELDMAN:** All right. All right, I

13 have listened to the proffer of both the Government and the

14 defense.  I am ready to render a decision.

15         Mr. Rosica, the Government has moved to detain you

16 without bail and it's my job to determine whether that motion

17 should be granted.

18         There are a variety of factors I'm required to

19 consider and one of them, which we've talked about today, is

20 the strength of the Government's case.  And I think it's kind

21 of difficult for me to explain to you why that's something I

22 should consider because you're presumed innocent, but to the

23 extent the strength of the Government's case reflects on the

24 character of the accused and the nature and circumstances of

25 the offense as it relates to bail, it is something that I can

1  and must consider.

2        I think as everyone acknowledged here, I have been

3  involved with the case for a while now; I've signed several

4  search warrants and signed the complaint.  So I am aware of

5  the strength of the Government's case and I think it is a

6  strong case.

7        I think the evidence suggests that you used

8  sophisticated and complex techniques to terrorize someone

9  here.  And the FBI, through their own technical expertise, has

10  appeared to directly tie you to that, what can fairly be

11  described as, at least I described it based on what I've read

12  in the complaint, as something approaching sadistic behavior.

13        The other thing I can consider is the character of

14  the accused and the nature and circumstances of the offense

15  insofar as they would allow me to consider whether you would

16  comply with any conditions of release.

17        I say this in many bail situations: Predicting

18  human behavior is beyond me.  If there was a computer program

19  or a litmus test I could give or use to predict whether you

20  would comply with conditions of release, I certainly would

21  employ it right now.

22        You really present a conundrum in terms of

23  different aspects of your life, but there isn't such a test or

24  a computer program I can use.  So we judges are left to use

25  our common sense and our experience and examining what we do

1  know about an accused to see if there are any indications that

2  if released, the person would present a danger.

3      And here the danger that the Government has moved

4  upon is found in 18, U.S.C., Section 3142(f)(2)(B), and it

5  requires the Government to demonstrate to me that you will

6  present a serious risk of threatening, injuring or

7  intimidating a prospective witness.  In this case the

8  Government said it's the victim.

9      Now, the crime you're charged with is commonly

10  referred to as "cyber stalking," but in some cases the word

11  stalking really doesn't adequately describe the criminal

12  behavior that's charged.

13      And I know Mr. Zimmerman has asked me to analyze

14  and evaluate your conduct on the spectrum of cyber stalking,

15  and I respectfully disagree with him to the extent that he

16  minimizes what the behavior here is.

17      I think the FBI has developed strong evidence that

18  you terrorized the victim in a very sophisticated and

19  deliberately secretive method.

20      The Government has proffered in the complaint,

21  which I incorporate into my decision here, found that you used

22  this Tor network and by using the Tor network you tried to

23  make sure that you could evade detection by both the victim

24  and law enforcement by ensuring that the threats and

25  intimidating behavior that you allegedly used could never be

1   traced back to your own computer or your own IP address.

2            I don't think this is a case of simple cyber

3   bullying.  The Government's proffer is that you engaged in a

4   long-term campaign to abuse and torment this victim.  The

5   Government's proffer included evidence that you went so far as

6   to encourage your victim to commit suicide by sending her

7   website links on how to do that; by sending her anonymous

8   texts on how to go to sites that include 10 minute suicide

9   guide and painless ways to commit suicide.

10           The Government complaint has proffered that you

11  threatened to reveal very personal and confidential medical

12  information to the victim's child about the victim.

13           That you tried to hack into the victim employer's

14  computer system.

15           That you tried to hack into the victim's University

16  of Rochester medical records.

17           That you set up fake e-mail accounts and then

18  e-mailed the victim's supervisors at work telling them to

19  investigate her.

20           Disparaging her with claims of mental illness and

21  medications she's taking.

22           And this is not limited to cyber conduct.  The

23  Government has proffered that you physically surveilled the

24  victim and followed her, sending her pictures from fake e-mail

25  addresses to show that you're observing her.

1          Texting her at night or e-mailing her telling her

2  to remember to shut the lights off.

3          Calling her pharmacist and inquiring about the

4  medications she's on, multiple times a day over the course of

5  many months.

6          And even impersonating the victim's primary care

7  physician in an attempt to gain medical information.

8          So I say this because the crime, I think, is not

9  one of a momentary lapse of judgment, but really a campaign of

10  abuse and terror committed over the course of a year.

11          And I say that because in terms of the bail issue I

12  have to consider, if I were to set conditions of bail, could I

13  count on you following them?

14          Now, again you're presumed innocent, but as a law

15  enforcement officer there can be no doubt that if you did

16  these things, you knew at the time you were doing them that

17  they could lead to the moment we're both presented with right

18  now where you were apprehended.

19          And despite that risk to yourself, to your family,

20  your job, you were willing to take that risk, according to the

21  Government, and that really concerns me in terms of what

22  you're capable of risking if I was to set conditions of

23  release.

24          The Probation Department recommends detention, and

25  I incorporate their findings into this decision.

1            I guess the bottom line is that the Government has

2   presented evidence of behavior that's unpredictable,

3   irrational and certainly dangerous.

4            The level of psychological disturbance here is so

5   persuasive, that I don't believe I can reasonably set

6   conditions that would assure me that you would comply with any

7   release conditions which would reasonably assure the safety of

8   the victim. Therefore, it's my decision that you should be

9   detained pending trial.

10            Now, Mr. Zimmerman can explain to you that my

11   decision can be reviewed by a District Court judge and that

12   judge has to review it *de novo* and he can explain that process

13   to you.

14            I'll do everything I can, because you're detained

15   with the presumption of innocence, to move the case along, but

16   at least based on the evidence that I know now, I think the

17   law requires me to detain you.  So that's my decision.

18            Would you like to set up a preliminary examination

19   date?  Would you like some time to talk to the Government?

20            **MR. ZIMMERMAN:** I would like some time, Your Honor.

21   If we could set a date, just a control, and I'd waive any

22   speedy trial --

23            **MAGISTRATE JUDGE FELDMAN:** Would you like about 30

24   days or more?

25            **MR. ZIMMERMAN:** Actually, Judge, can we have --

1  would that be enough time --

2          **MS. MARANGOLA:** Yes, Judge, I'll attempt to get

3  discovery out in the next -- if I can have ten days, two

4  weeks, because it's voluminous at this point.

5          **MR. ZIMMERMAN:** Based on that timeframe --

6          **MAGISTRATE JUDGE FELDMAN:** -- if you get discovery

7  within two weeks --

8          **MR. ZIMMERMAN:** -- 30 days would be fine, Judge.

9          **MAGISTRATE JUDGE FELDMAN:** 30 days?  Okay.

10  April 4th at 2 p.m., is that okay?

11          **MR. ZIMMERMAN:** If I could just check real quick,

12  Judge?

13          **MS. MARANGOLA:** I'm sorry, Judge, I missed the date.

14          **MAGISTRATE JUDGE FELDMAN:** April 4th.

15          **MS. MARANGOLA:** That's fine.  Mr. Gestring will be

16  taking over the case in my absence.

17          **MAGISTRATE JUDGE FELDMAN:** Okay.

18          **MR. ZIMMERMAN:** Judge, I'm actually on trial --

19  April 4th you said?

20          **MAGISTRATE JUDGE FELDMAN:** Yeah.  Would you like

21  later in that week?

22          **MR. ZIMMERMAN:** Could we -- could we do earlier?  So

23  March 31st?

24          **MAGISTRATE JUDGE FELDMAN:** How's April 1st?

25          **MR. ZIMMERMAN:** I think it's a Saturday.

| | |
|---|---|
| 1 | **MAGISTRATE JUDGE FELDMAN:** Oh, I'm sorry. |
| 2 | **MR. ZIMMERMAN:** I mean, I'll certainly -- |
| 3 | **MAGISTRATE JUDGE FELDMAN:** No.  Sure, that's -- you |
| 4 | start the trial the following Monday? |
| 5 | **MR. ZIMMERMAN:** Correct. |
| 6 | **MAGISTRATE JUDGE FELDMAN:** Okay, why don't we do |
| 7 | 3:30 on the 31st? |
| 8 | **MR. ZIMMERMAN:** Thank you. |
| 9 | **MAGISTRATE JUDGE FELDMAN:** Mr. Gestring, is that |
| 10 | okay? |
| 11 | **MR. GESTRING:** Good to go, Judge, thank you. |
| 12 | **MAGISTRATE JUDGE FELDMAN:** All right, anything else |
| 13 | we need to do today?  All right, thank you. |
| 14 | **MS. MARANGOLA:** Did you exclude the time, Judge? |
| 15 | **MR. ZIMMERMAN:** I did say I would. |
| 16 | **MAGISTRATE JUDGE FELDMAN:** Yeah, I'll make a finding |
| 17 | based on the defendant's motion, as joined in by the |
| 18 | Government, I do find that the defendant and the public's |
| 19 | interest in having this case go to trial is outweighed by the |
| 20 | defendant's interest in getting some pre-indictment discovery |
| 21 | and beginning discussions with the Government as perhaps |
| 22 | whether this case can be resolved. |
| 23 | Therefore, the time between today and the adjourn |
| 24 | date is excluded from the speedy indictment clock in the |
| 25 | interest of justice. |

1           **MS. MARANGOLA:** Thank you.

2           **MR. GESTRING:** Thank you, Judge.

3           **MAGISTRATE JUDGE FELDMAN:** Thank you.

4           (**WHEREUPON**, proceedings adjourned at 11:28 a.m.)

5                        *    *    *

6                 **CERTIFICATE OF TRANSCRIBER**

7

8           In accordance with 28, U.S.C., 753(b), I certify that

9   this is a true and correct record of proceedings from the

10   official electronic sound recording of the proceedings in the

11   United States District Court for the Western District of New

12   York before the Honorable Jonathan W. Feldman on March 3rd,

13   2017.

14

15   S/ Christi A. Macri

16   Christi A. Macri, FAPR-CRR
     Official Court Reporter

17

18

19

20

21

22

23

24

25